Kenneth S. August
kaugust@augustlawgroup.com
CA Bar No. 152704
19200 Von Karman Ave, Ste 600
Irvine, California 92612
Fax No. N/A

Blake W. Meadows
blake@smithmeadowslaw.com
GA Bar No. 569729
215 Greencastle Rd, Ste B
Tyrone, Georgia
Fax No. N/A

*For Cornerstone Payment Systems, Inc.*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Cornerstone Payment Systems, Inc.<br><br><br>          Plaintiff,<br><br>v.<br><br>(1) Pleros LLC; (2) Auden Lily Group LLC; (3) Quba.pro Inc.; (4) Standard Goods LLC; (5) Standard Way, LLC; (6) Rodem Tree LLC; (7) Olivet University, Inc.; (8) World Olivet Assembly, Inc.; (9) Olivet Assembly, Inc. a/k/a Olivet Assembly USA; (10) Dover Greens LLC; (11) 1000 East First Estates LLC; (12) Jubilee World, Inc.; (13) Jubilee University; (14) Great Commission University; (15) 7725 Penrose LLC; (16) Christian Innovation Center LLC; (17) Good Manager Holdings Inc.; (18) Nicolas Haman a/k/a Nicholas Haman; (19) Jung Mi Lee; (20) Daewon Kim; (21) Younghai Ko a/k/a Young Hai Ko a/k/a Youngshai Ko a/k/a Emily Ko; (22) Alma Osorio a/k/a Alma Osario; | CASE NUMBER:<br><br>_____<br>To be supplied by the Clerk of the United States District Court<br>_____<br><br><br><br><br>**COMPLAINT**<br>**SEEKING DAMAGES** |

1

(23) Ruby Hwang; (24) Anthony Chiu a/k/a Juan We Chiu; (25) Andrew Lin a/k/a Tony Lin; (26) Haejo Yim; (27) John Doe; and (28) John Doe Corporation.

Defendants.

COMES NOW, Cornerstone Payment Systems, Inc. ("Cornerstone"), the plaintiff in the above-styled case, by and through its undersigned counsel, and hereby submits this Complaint Seeking Damages, thereby showing this Honorable Court the following:

## I.    PARTIES

1.    Plaintiff, Cornerstone, is a corporation duly formed and incorporated in the State of California, having its principal place of business at 17822 E. Seventeenth St., Suite 412, Tustin, California 92780.

2.    Defendant, Pleros LLC d/b/a Neomen ("Pleros"), is a limited liability company duly formed under the laws of the State of Delaware. Pleros is a foreign limited liability company registered to do business in the State of California, whose registered agent is Sungmi Duckworth, who may be served at 26323 Jefferson, Ave, Suite E-105, Murrieta, California 92562.

3.    Defendant, Auden Lily Group LLC ("Auden"), is a limited liability company duly formed under the laws of the State of Delaware that engages in business within the State of California without being registered to do business in the

State of California, and this lawsuit arises from Auden's business in the State of California. Therefore, the Secretary of State of California is deemed as the agent of Auden, and service may be conducted on Auden by the Secretary of State through the delivery of the copy of the process for Auden along with the respective court order authorizing service to the Secretary of State of California.

4.      Defendant, Quba.pro Inc. ("Quba.pro"), is a corporation duly formed and incorporated under the laws of the State of New York that engages in business within the State of California without being registered to do business in the State of California, and this lawsuit arises from Quba.pro's business in the State of California. Therefore, the Secretary of State of California is deemed as the agent of Quba.pro, and service may be conducted on Quba.pro by the Secretary of State of California through the delivery of the copy of the process for Quba.pro along with the respective court order authorizing service to the Secretary of State of California.

5.      Defendant, Standard Goods LLC ("Standard Goods"), is a limited liability company duly formed under the laws of the State of Delaware that engages in business within the State of California without being registered to do business in the State of California, and this lawsuit arises from Standard Goods' business in the State of California. Therefore, the Secretary of State of California is deemed as the agent of Standard Goods, and service may be conducted on Standard Goods by the Secretary of State of California through delivery of the copy of the process for

Standard Goods along with the respective court order authorizing service to the Secretary of State of California.

6.      Defendant, Standard Way, LLC ("Standard Way"), is a limited liability company duly formed under the laws of the State of Delaware that engages in business within the State of California without being registered to do business in the State of California, and this lawsuit arises from Standard Way's business in the State of California. Therefore, the Secretary of State of California is deemed as the agent of Standard Way, and service may be conducted on Standard Way by the Secretary of State of California through delivery of the copy of the process for Standard Way along with the respective court order authorizing service to the Secretary of State of California.

7.      Defendant, Rodem Tree LLC ("Rodem Tree"), is a limited liability company formed under the laws of the State of Delaware that engages in business within the State of California without being registered to do business in the State of California, and this lawsuit arises from Rodem Trees' business in the State of California. Therefore, the Secretary of State of California is deemed as the agent of Rodem Tree, and service may be conducted on Rodem Tree by the Secretary of State of California through the delivery of the copy of the process for Rodem Tree along with the respective court order authorizing the service to Secretary of State of California.

8.     Defendant, Olivet University Inc. ("Olivet University"), is a nonprofit corporation duly formed and incorporated under the laws of the State of California, having its principal place of business at 36401 Tripp Flats Road, Anza, California 92539, whose registered agent is INCORP Services, Inc., who may be served at 5716 Corsa Avenue, Suite 110, Westlake Village, California. Steven Picket, Timothy Duncan, Leesah Marston, and Breanna Ruiz are authorized to accept service under Cal Corp. Code § 1505.

9.     Defendant, World Olivet Assembly, Inc. ("WOA"), a nonprofit corporation that is duly formed and incorporated under the laws of the State of New York and is registered to do business in California. WOA is a foreign nonprofit corporation registered to do business in the State of California, whose registered agent is California Corporate Agents, Inc. Chris Johnson is authorized to accept service under Cal. Corp. Code § 1505.

10.     Defendant, Olivet Assembly, Inc. a/k/a Olivet Assembly USA ("Olivet Assembly USA"), is a nonprofit corporation formed under the laws of the State of New York that has engaged in business within the State of California without being registered to do business in the State of California. Therefore, the Secretary of State of California is deemed as the agent of Olivet Assembly USA, and service may be conducted on Olivet Assembly USA by the Secretary of State of California through the delivery of the copy of the process for Olivet Assembly USA along with the

respective court order authorizing service to the Secretary of State of California.

11. Defendant, Jubilee World, Inc. ("Jubilee World"), is a nonprofit corporation formed under the laws of the State of California, having a principal place of business at 1 Oliver Lane, Apartment A, Mill Valley, California 04041, whose registered agent is Younjung Kim, who may be served at 1 Oliver Lane, Apartment A, Mill Valley, California 94941.

12. Defendant, Jubilee University, is a foreign nonprofit corporation formed under the laws of the State of Missouri that has engaged in business with the State of California without being registered to do business in the State of California, and this lawsuit arises from Jubilee University's business in the State of California. Therefore, the Secretary of State of California is deemed as the agent of Jubilee University, and service may be conducted on the Secretary of State of California through the delivery of the copy of the process for Jubilee University along with the respective court order authorizing service to the Secretary of State of California.

13. Defendant, Great Commission University, is a foreign nonprofit corporation formed under the laws of the State of Indiana that has engaged in business with the State of California without being registered to do business in the State of California, and this lawsuit arises from Great Commission University's business in the State of California. Therefore, the Secretary of State of California is deemed as the agent of Great Commission University, and service may be conducted

on the Secretary of State of California through the delivery of the copy of the process for Great Commission University along with the respective court order authorizing service to the Secretary of State of California.

14. Defendant, Dover Greens LLC ("Dover Greens"), is a foreign limited liability company formed under the laws of the State of New York that has engaged in business with the State of California without being registered to do business in the State of California, and this lawsuit arises from Dover Greens's business in the State of California. Therefore, the Secretary of State of California is deemed as the agent of Dover Greens, and service may be conducted on the Secretary of State of California through the delivery of the copy of the process for Dover Greens along with the respective court order authorizing service to the Secretary of State of California.

15. Defendant, 7725 Penrose LLC ("7725 Penrose"), is a foreign limited liability company formed under the laws of the Commonwealth of Pennsylvania that has engaged in business with the State of California without being registered to do business in the State of California, and this lawsuit arises from 7725 Penrose's business in the State of California. Therefore, the Secretary of State of California is deemed as the agent of 7725 Penrose, and service may be conducted on the Secretary of State of California through the delivery of the copy of the process for 7725 Penrose along with the respective court order authorizing service to the Secretary of

State of California.

16.    Defendant, 1000 East First Estates LLC ("First Estates"), is a limited liability company formed under the laws of the State of Florida that has engaged in business with the State of California without being registered to do business in the State of California, and this lawsuit arises from First Estates' business in the State of California. Therefore, the Secretary of State of California is deemed as the agent of First Estates, and service may be conducted on the Secretary of State of California through the delivery of the copy of the process for First Estates along with the respective court authorizing service to the Secretary of State of California.

17.    Defendant, Christian Innovation Center LLC, is a limited liability company formed under the laws of Washington, D.C., that has engaged in business with the State of California without being registered to do business in the State of California, and this lawsuit arises from Christian Innovation Center LLC's business in the State of California. Therefore, the Secretary of State of California is deemed as the agent of Christian Innovation Center LLC, and service may be conducted on the Secretary of State of California through the delivery of the copy of the process for Christian Innovation Center LLC along with the respective court order authorizing service to the Secretary of State of California.

18.    Defendant, Good Manager Holdings Inc. ("Good Manager"), is a foreign corporation that is duly formed and incorporated under the laws of the State

of Delaware and is registered to do business in California. Good Manager is registered to do business in the State of California, whose registered agent is Jong Joo Jang, located at 2400 Bridgeway, Suite 280, Sausalito, California 94965.

19.    Defendant, Nicolas Haman a/k/a Nicholas Haman ("Haman"), is an individual, who, upon information and belief, resides at and may be served at 1539 Route 22, Wingdale, New York 12594.

20.    Defendant, Jung Mi Lee ("Lee"), is an individual, who, upon information and belief, resides at and may be served at 193 Dover Furnace Road, Dover Plains, New York 12522.

21.    Defendant, Daewon Kim ("Kim"), is an individual, who, upon information and belief, resides at and may be served at 3483 Pleasant Ridge Road, Wingdale, New York 12594.

22.    Defendant, Younghai Ko a/k/a Young Hai Ko a/k/a Youngshai Ko a/k/a Emily Ko ("Ko"), is an individual, who, upon information and belief, resides at and may be served at 52790 Ardwell Dr., Anza, California 92539.

23.    Defendant, Alma Osorio a/k/a Alma Osario ("Osorio"), is an individual, who, upon information and belief, resides at and may be served at 700 E 156th Street, Bronx, New York 10455.

24.    Defendant, Ruby Hwang ("Hwang"), is an individual, who, upon information and belief, resides at and may be served at 2545-2549 Route 22, Dover

Plains, New York 12522.

25.    Defendant, Anthony Chiu a/k/a Juan We Chiu ("Chiu"), is an individual, who, upon information and belief, resides at and may be served at 884 Chestnut Ridge Road, Millbrook, New York 12545.

26.    Defendant, Andrew Lin a/k/a Tony Lin ("Lin"), is an individual, who, upon information and belief, resides at and may be served at 52675 Ardwell Dr., Anza, California 92539.

27.    Defendant, Haejo Yim ("Yim"), is an individual, who, upon information and belief, resides at and may be served at 181 Johnson Road, Wingdale, New York 12594.

## II.    JURISDICTION, VENUE, AND GOVERNING LAW

28.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the present case presents a federal question under 18 U.S.C. § 1961, *et seq*. The Court likewise has supplemental jurisdiction, as needed over state law claims under 28 U.S.C. § 1367.

29.    This Court has personal jurisdiction over all named Defendants in the above-styled action because of the Defendants' purposeful availment through sufficient business contacts. Furthermore, Pleros, Auden, Quba.pro, Standard Goods, Standard Way, Rodem Tree, Olivet University, WOA, Haman, Lee, Kim, Ko, Osorio, Hwang, Chiu, and Lin consented to personal jurisdiction in this Court

by entering into their respective Agreements of Sale of Future Receivables. Paragraph 52 of the Agreements of Sale of Future Receivables require that all disputes arising from or relating to the Agreement of Sale of Future Receivables must be brought in "any court sitting in the State of California." Paragraph 52 also contains a waiver, thereby waiving any and all objections to the inconvenience of California as a forum.

30.    This Court is a proper venue under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Cornerstone's claims occurred in the Central District of California. Furthermore, by Pleros, Auden, Quba.pro, Standard Goods, Standard Way, Rodem Tree, Olivet University, WOA, Haman, Lee, Kim, Ko, Osorio, Hwang, Chiu, and Lin signing the respective Agreements of Sale of Future Receivables, the foregoing parties consented to venue in this Court, as contemplated by Paragraph 52.

## III.    FACTS GIVING RISE TO THE DISPUTE

### *Cornerstone's Business Model*

31.    Cornerstone engages in the commercial business of factoring transactions. Cornerstone's factoring transactions involve Cornerstone purchasing a specified quantity of accounts receivable from a business at a discounted price. This purchase of accounts receivable allows for the seller to receive an immediate influx of available funds in exchange for paying over to Cornerstone the accounts

receivable plus a specified percentage of the outstanding balance until the sold amount of accounts receivable are fully paid over to Cornerstone ("Basic Factoring Percentage"). As part of this transaction, there are minimum payments that must be paid on a monthly basis and failing to make said payments results in a missed payment fee (defined as "Missed Payment Fee" below).

32.     The seller understands and contractually agrees that Cornerstone is not loaning money to seller, but, instead, Cornerstone is purchasing accounts receivable from the seller.

33.     Cornerstone's relationship with the seller in a factoring transaction is governed by a contract known as the Agreement of Sale of Future Receivables ("Master Agreement"). Cornerstone and the seller enter into the Master Agreement and agree to be bound to the terms and conditions contained therein.

34.     The Master Agreement states the purchase price, quantity of accounts receivable purchased, and the terms governing remittance of payment of the accounts receivable.

35.     The Master Agreement imposes a fee of $2,500.00 for each instance of seller's failure to properly submit payment or perform any other obligation contained within the Master Agreement ("Missed Payment Fee").

36.     Cornerstone secures the purchase of accounts receivable through a security agreement contained within the Master Agreement that grants Cornerstone

12

a security interest in all accounts, including without limitation, all deposit accounts, accounts receivable, other receivables, chattel paper, documents, equipment, real estate, general intangibles, instruments, inventory, and proceeds of the foregoing, as those terms are defined by Division 9 of the California Commercial Code (CCC). Cornerstone's security interest also extends to all after-acquired collateral.

37.     In the Master Agreement, the seller represents to Cornerstone that it has not previously sold the accounts receivable that Cornerstone is purchasing. Furthermore, the seller represents to Cornerstone that there is no lien, encumbrance, nor any third party that has any interest in the accounts receivable Cornerstone is purchasing.

38.     Cornerstone requires personal guarantors to guarantee all of the seller's obligations contained within the Master Agreement.

39.     The seller agrees to use the purchase price paid by Cornerstone for the benefit and advancement of seller's business and for no other purpose.

***Olivet Syndicate***

40.     Pleros, Auden, Quba.pro, Standard Goods, Standard Way, Rodem Tree, Olivet, and WOA comprise a group of connected sellers of accounts receivable to Cornerstone. For ease of reference, Pleros, Auden, Quba.pro, Standard Goods, Standard Way, Rodem Tree, Olivet, and WOA are collectively referred to as the "Merchant Defendants." Also, for ease of reference, Haman, Lee, Kim, Ko, Osorio,

Hwang, Chiu, Lin, and Yim are collectively referred to herein as "Principals."

41.    As detailed below, the Merchant Defendants and the Principals, *inter alia*, are connected through membership in or an affiliation with a religious sect known as the World Olivet Assembly (the "Community").

42.    The Community is composed of a global conglomeration of churches, schools, and other businesses and organizations that work to provide resources for the Community and control the narrative relating to the Community.[1] While global, the Community is structured with regional and national entities.

43.    As stated below, churches, schools, businesses and other organizations are connected by sharing the same personnel and moving funds between themselves.

44.    Upon information and belief, the Community uses the resources obtained by the schools, churches, businesses, and other organizations to purchase real property throughout the United States, including, but not limited to, New York, California, Illinois, Florida, and Tennessee, all for the benefit of the Community.

45.    The Merchant Defendants engaged in factoring transactions with Cornerstone by entering into Master Agreements with Cornerstone. The Principals

---

[1]    *See* https://www.yahoo.com/news/religious-university-without-students-campus 023000552.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlL mNvbS8&guce_referrer_sig=AQAAACSHnVyi2QDH95rqNrrQc197Nv4KQufV HB7gfp4h6tiYSfZvN70rngdEsQ0eGoUsNA_gwR86WxzaC6vvgWSieyv0IppKJZ Bs2cz3AavKpnFc0Wzj5CtsqpsPoSBq3oGjT2E_odwG_P1mt6Ee4XJ5v20ocbvRL hYqIeJnQ2lhkiSd; https://worldolivet.org/who.

14

obligated themselves as personal guarantors for the Master Agreements entered into by their respective businesses or organizations.

46.    The Merchant Defendants represented to Cornerstone that they operated businesses that offered services or products that generated significant accounts receivable, such that Merchant Defendants could sell and pay over to Cornerstone the accounts receivable purchased by Cornerstone under the relevant agreement.

47.    After Cornerstone issued the funds pursuant to the Master Agreements, most of the Merchant Defendants refused to pay over all the accounts receivable despite receiving payment from the account-debtors.

48.    Upon information and belief, Merchant Defendants did not use the purchase price paid by Cornerstone to generate additional revenue and remit payment of the purchased accounts receivable to Cornerstone.

49.    Rather, Merchant Defendants circulated the funds paid by Cornerstone to associated entities with the Merchant Defendants and, in turn, the funds flowed to the Community. Upon information and belief, the funds were ultimately used for the acquisition of real property for the Community.

50.    As shown below, the Merchant Defendants, Principals, and associated entities connected to the Community form an association-in-fact enterprise formed for the purpose of funding the Community through wire fraud and racketeering

activity as prohibited by 18 U.S.C. § 1962 *et seq.* (the Racketeering Influence and Corrupt Organization Act, hereinafter referred to as "RICO"). This connected network of entities and individuals conspired to and did defraud Cornerstone out of millions of dollars in furtherance of their enterprise. These facts are further detailed below.

***The Merchant Defendants, Principals, and Corresponding Purchase Agreements***

**Pleros & Ko**

51.　Pleros is an online merchant dealing in goods relating to or involving cosmetic and other healthcare related products.

52.　Ko is the owner and operator of Pleros.

53.　Ko's residence—52790 Ardwell Dr., Anza, California 92539, is owned by Olivet University, as shown by the recorded deed, Document No. 2017-0037361, with the County of Riverside Assessor-County Clerk-Recorder.

54.　On or around October 29, 2019, Pleros entered into a Master Agreement with Cornerstone ("Pleros Purchase Agreement"). A true and accurate copy of the Pleros Settlement is attached hereto as Exhibit A.

55.　Under the Pleros Purchase Agreement, Cornerstone agreed to purchase accounts receivable worth $550,000.00, which Pleros was obligated to pay over to Cornerstone along with a monthly factoring fee in the amount of $25,000.00 per month until the accounts receivable were fully paid over to Cornerstone.

16

56.    Under the Pleros Purchase Agreement, Pleros granted Cornerstone a security interest in all accounts, including without limitation, all deposit accounts, accounts receivable, other receivables, chattel paper, documents, equipment, real estate, general intangibles, instruments, inventory, and proceeds of the foregoing, including all after-acquired collateral.

57.    Cornerstone performed its obligation under the Pleros Purchase Agreement by paying over to Pleros the purchase price for the purchased accounts receivable.

58.    Upon information and belief, Pleros received payment from the account-debtors for the accounts receivable Cornerstone purchased. Pleros has failed to pay over all the accounts receivable to Cornerstone, per the requirements of the Pleros Purchase Agreement. Pleros has also failed to pay over the monthly factoring fee for every month that Pleros failed to pay over the accounts receivable. Pleros continues to fail to pay over the purchased accounts receivable in full.

59.    Ko controlled and operated Pleros, and was directly responsible for, or had authority over the funds Pleros received, spent, and otherwise managed. Ko oversaw Pleros's bank accounts, thereby giving Ko control over all funds to ensure that Pleros satisfied its obligations to Cornerstone.

60.    Ko was also obligated under the Pleros Purchase Agreement in Ko's individual and personal capacity, as Ko agreed to be a personal guarantor for all

obligations Pleros agreed to under the Pleros Purchase Agreement.

61.   Cornerstone never received the purchased accounts receivable from Pleros, despite Cornerstone performing its obligations under the Pleros Purchase Agreement. Instead of remitting to Cornerstone the funds relating to the purchased accounts receivable, Pleros diverted the funds from Cornerstone and never fully satisfied its obligations to Cornerstone.

62.   Upon information and belief, Pleros diverted the funds for the benefit of the Community, instead of using the funds for the purpose of generating additional revenue for Pleros to satisfy all obligations to Cornerstone.

63.   Cornerstone negotiated a settlement with Ko and Pleros for Cornerstone to receive payment in lieu of litigation. Lin negotiated on behalf of Ko and Pleros. A true, accurate, and complete copy of an email exchange between Cornerstone and Ko indicating that Lin had agreed to terms on behalf of Ko and Pleros is attached hereto as Exhibit B.

64.   Ko, on behalf of Pleros, entered into a settlement agreement titled: "Settlement and Resolution Agreement," on April 14, 2021 ("Pleros Settlement"). A true, accurate, and complete copy of the Pleros Settlement is attached hereto as Exhibit C.

65.   In the Pleros Settlement, Ko stipulated that as of April 14, 2021, the amount owed under the Pleros Purchase Agreement to Cornerstone was in the

amount of $1,023,650.23. Cornerstone agreed to accept $796,867.27 upon satisfaction of all conditions contained in the Pleros Settlement.

66.    The foregoing settlement amount was to be paid in two installments, with the first installment being due on April 15, 2021, and the second installment being due on April 30, 2021. Ko and Pleros issued the first payment on April 15, 2021, but later failed to issue full payment for the second installment to Cornerstone by April 30, 2021. The Pleros Settlement required that if the settlement amount was not paid, then the full amount owed becomes due.

67.    Because Pleros failed to timely remit to Cornerstone full payment under the Pleros Purchase Agreement and in the manner specified therein, Pleros incurred Missed Payment Fees.

68.    After the allowance of all just and lawful offsets, payments, and credits to Pleros's account allowable under the Pleros Purchase Agreement, a balance of $1,625,099.50 remains due, unremitted, and owed to Cornerstone.

**Auden & Osorio**

69.    Auden is an online merchant who specializes in selling goods, specifically on amazon.com.

70.    Osorio is the owner and operator of Auden.

71.    According to a 2023 tax filing by WOA, Osorio is a trustee of WOA.[2]

---

[2] https://projects.propublica.org/nonprofits/organizations/461616553.

72.    On or around July 12, 2019, Auden entered into a Master Agreement with Cornerstone ("Auden Purchase Agreement"). A true, accurate, and complete copy of the Auden Purchase Agreement is attached hereto and made a part hereof as Exhibit D.

73.    Under the Auden Purchase Agreement, Cornerstone agreed to purchase accounts receivable worth $120,000.00, which Auden was obligated to pay over along with a monthly factoring fee in the amount of $6,000.00 per month until the accounts receivable were fully paid over to Cornerstone ("First Auden Order").

74.    In the Auden Purchase Agreement, Auden represented that all sums due to Auden as payment for its goods and services in its ordinary course of business amounted to approximately $425,000.00.

75.    Under the Auden Purchase Agreement, Auden granted Cornerstone a security interest in all accounts, including without limitation, all deposit accounts, accounts receivable, and other receivables, chattel paper, documents, equipment, real estate, general intangibles, instruments, inventory, and proceeds of the foregoing, including all after-acquired collateral.

76.    Auden subsequently offered Cornerstone more accounts receivable to purchase, as Auden represented to Cornerstone that it was launching a new "private label" brand, which had an anticipated high rate of return on investment.

77.    On or around October 15, 2019, Cornerstone purchased additional

20

accounts receivable worth $220,000.00, which Auden was obligated to pay over said accounts receivable and a monthly factoring for every month until the accounts receivable were fully paid over to Cornerstone ("Second Auden Order").

78.    The Second Auden Order was issued pursuant to an Order Form, which incorporated the rights, terms, and conditions stated in the Auden Purchase Agreement. A true, accurate, and complete copy of the Order Form is attached hereto as Exhibit E.

79.    Cornerstone performed its obligations under the Auden Purchase Agreement for both the First Auden Order and the Second Auden Order by paying over to Auden the purchase price for the purchased accounts receivable.

80.    Upon information and belief, Auden received payment from the account-debtors for the accounts receivable Cornerstone purchased under the First Auden Order and the Second Auden Order. Auden has failed to deposit accounts receivable into the bank account that Cornerstone has access to, per the requirements of the Auden Purchase Agreement.

81.    On or around October 9, 2019, Tina Taylor ("Taylor"), an account manager for Auden, Rodem Tree, and Standard Goods, contacted Cornerstone. Taylor informed Cornerstone that Auden would wire all funds owed under the First Auden Order to Cornerstone. Taylor copied Lin on the email, with Lin's email address being alin@olivetuniversity.edu. A true, accurate, and complete copy of

Taylor's email is attached hereto as Exhibit F.

82.    On October 15, 2019, Taylor provided information for a wire transfer to Cornerstone in payment of the accounts receivable purchased under the First Auden Order. The wire transfer never occurred. A true, accurate, and complete copy of Taylor's email is attached hereto as Exhibit G.

83.    Taylor further represented to Cornerstone that because of Cornerstone's purchasing of accounts receivable under the First Auden Order, Auden's revenue greatly increased allowing for extensive donations to various charities. However, upon information and belief, the funds allegedly donated were circulated to and for the benefit of the Community. (Exhibit G).

84.    Cornerstone remains owed accounts receivable under the First Auden Order and the Second Auden Order.

85.    Osorio was also obligated under the Auden Purchase Agreement in Osorio's individual and personal capacity, as Osorio agreed to sign as a personal guarantor of all obligations Auden agreed to under the Auden Purchase Agreement.

86.    Cornerstone never received all the purchased accounts receivable from Auden, despite Cornerstone performing its obligations under the Auden Purchase Agreement. Instead of remitting to Cornerstone the funds relating to the purchased accounts receivable, Auden diverted the funds from Cornerstone and never satisfied its obligations to Cornerstone.

87.    Upon information and belief, Auden diverted funds for the benefit of the Community, instead of using the funds for the purpose of generating additional revenue for Auden to satisfy all obligations to Cornerstone. Upon information and belief, the Christian charity organizations referenced by Taylor are either within or affiliated with the Community.

88.    Cornerstone negotiated with Lin regarding settlement of the amounts owed by Auden and Osorio to Cornerstone. Lin informed Cornerstone that Yim was a newly authorized representative of Auden. However, Osorio remained obligated as a personal guarantor under the Auden Purchase Agreement.

89.    Yim, on behalf of Auden, entered into a settlement agreement titled: "Settlement and Resolution Agreement," on April 14, 2021 ("Auden Settlement"). A true, accurate, and complete copy of the Auden Settlement is attached hereto as Exhibit H.

90.    The Auden Settlement required payment on April 15, 2021, and April 30, 2021. The Auden Settlement required that if the settlement amount was not paid, then the full amount owed becomes due. Cornerstone was never paid over the settlement amount stated within the Auden Settlement.

91.    Auden failed to timely submit full payments pursuant to the Auden Settlement. Because Auden failed to comply with the obligations contained in the Auden Settlement, all prior amounts owed become due.

92.    Osorio executed a confession of judgment on July 12, 2019, by which she confessed and authorized the entry of judgment against Osorio and Auden, jointly and severally, in the amount of $120,000.00 plus simple interest thereon at the annual rate of twelve percent (12%) from the time of breach, along with all costs and attorney's fees, with attorney's fees being calculated at twenty-five percent (25%) of the total sum owed to Cornerstone for the First Auden Order ("Osorio Confession of Judgment"). Furthermore, the Osorio Confession of Judgment also applied to the Second Auden Order, as shown by the Order Form. (Exhibit E). A true, accurate, and complete copy of the Osorio Confession of Judgment is attached hereto as Exhibit I.

93.    The Osorio Confession of Judgment was notarized by Yen-Yi Anderson ("Anderson"), counsel for Olivet and former professor at Olivet.[3] Anderson recently served as counsel for Olivet and all other defendants in a case similar to the above-styled case, which was filed in 2023 by 8Fig, Inc., a finance company, alleging that Olivet and the associated defendants engaged in wire fraud and ultimately defrauded 8Fig out of millions to support the Community and acquire real estate for the benefit of the Community. *8Fig, Inc. v. Stepup Funny, LLC*, 1:23-CV-00943-DII (W. Tx. Div. 2023).

---

[3]    https://www.newsweek.com/settlement-spares-david-jangs-olivet-assembly-racketeering-lawsuit-1824093.

24

94.    Upon information and belief, Anderson apprised Osorio and Auden of the rights, duties, and obligations incurred by executing the Osorio Confession of Judgment.

95.    Because Auden failed to timely remit to Cornerstone full payment under the Auden Purchase Agreement and in the manner specified therein, Auden incurred Missed Payment Fees.

96.    After the allowance of all just and lawful offsets, payments, and credits to Auden's account allowable under the Auden Purchase Agreement, a balance of $3,958,970.00 remains due, unremitted, and owing.

**Quba.pro & Haman**

97.    Quba.pro is an online merchant dealing in goods, specifically on amazon.com.

98.    Haman is the owner and operator of Quba.pro.

99.    Haman's stated address—1539 Route 22, Apt 7, Wingdale, New York 12594, is owned by Olivet University.

100.    Haman formerly served as the Executive Director but now serves as the Assessments and Publications Coordinator for Great Commission University. Haman formerly served as a project manager for Olivet University in connection with real property that Olivet University purchased in Iowa.[4]

---

[4] https://www.desmoinesregister.com/story/money/business/development/2017/05

101.   On or around October 18, 2019, Lin and Cornerstone negotiated for Quba.pro to sell some of its accounts receivable.

102.   On or around October 18, 2019, Quba.pro entered into a Master Agreement with Cornerstone ("Quba.pro Purchase Agreement"). A true, accurate, and complete copy of the Quba.pro Purchase Agreement is attached hereto and made a part hereof as Exhibit J.

103.   Under the Quba.pro Purchase Agreement, Cornerstone agreed to purchase accounts receivable worth $525,000.00, which Quba.pro was obligated to pay over said accounts receivable and a monthly factoring fee in the amount of $25,000.00 per month until the accounts receivable were fully paid to Cornerstone. The anticipated term of the Quba.pro Purchase Agreement was one (1) month.

104.   In the Quba.pro Purchase Agreement, Quba.pro represented that it generated in the ordinary course of business approximately $1,639,000.00 worth of accounts receivable.

105.   Under the Quba.pro Purchase Agreement, Quba.pro granted Cornerstone a security interest in all accounts, including without limitation, all deposit accounts, accounts receivable, other receivables, chattel paper, documents, equipment, real estate, general intangibles, instruments, inventory, and proceeds of

/03/des-moines-fighting-demolish-blighted-school-owned-california-evangelical-university/308623001/.

the foregoing, including all after-acquired collateral.

106.    Cornerstone performed its obligations under the Quba.pro Purchase Agreement by paying over to Quba.pro the purchase price for the purchased accounts receivable. Lin provided Cornerstone with Quba.pro's banking information for Quba.pro to receive the wired funds.

107.    Upon information and belief, Quba.pro received payment from the account-debtors for the accounts receivable Cornerstone purchased.

108.    Haman was also obligated under the Quba.pro Purchase Agreement in Haman's individual and personal capacity, as Haman agreed to sign as a personal guarantor of all obligations Quba.pro agreed to under the Quba.pro Purchase Agreement.

109.    Cornerstone did not timely receive the purchased accounts receivable from Quba.pro, despite Cornerstone performing its obligations under the Quba.pro Purchase Agreement. Instead of remitting to Cornerstone the funds relating to the purchased accounts receivable, Quba.pro diverted the funds from Cornerstone and did not timely and fully satisfy its obligations to Cornerstone.

110.    Upon information and belief, Quba.pro diverted funds for the benefit of the Community, instead of using the funds for the purpose of generating additional revenue for Quba.pro, as required under the Quba.pro Purchase Agreement.

111.    Cornerstone negotiated a settlement with Haman and Quba.pro for

Cornerstone to receive payment in lieu of litigation. Haman, on behalf of Quba.pro, entered a settlement agreement titled: "Settlement and Resolution Agreement," on April 16, 2021 ("Quba.pro Settlement"). A true, accurate, and complete copy of the Quba.pro Settlement is attached hereto as Exhibit K.

112.    In the Quba.pro Settlement, the amount Quba.pro owed Cornerstone was in the amount of $247,929.56. Cornerstone agreed to accept $210,000.00. The foregoing settlement amount was to be paid on April 15, 2021.

113.    Quba.pro ultimately issued payment soon or around the time Haman executed the Quba.pro Settlement.

### Standard Goods & Kim

114.    Standard Goods is an online merchant dealing in the sale of goods.

115.    Kim is the owner and operator of Standard Goods.

116.    Kim's stated address is 3483 Pleasant Ridge Drive, Wingdale, New York 12594, which is owned by WOA.

117.    On or around August 22, 2019, Standard Goods entered into a Master Agreement with Cornerstone ("Standard Goods Purchase Agreement"). A true, accurate, and complete copy of the Standard Goods Purchase Agreement is attached hereto and made a part hereof as Exhibit L.

118.    Under the Standard Goods Purchase Agreement, Cornerstone and Standard Goods agreed for Cornerstone to purchase around $400,000.00 of accounts

receivable with the option to purchase additional accounts receivable worth $300,000.00 upon Standard Goods timely remitting payment of the accounts receivable for the first $400,000.00 purchase.

119.   The Standard Goods Purchase Agreement divided the approximate $400,000.00 purchase into two tranches based on two separate Order Forms. The first Order Form governed the first tranche of accounts receivable, and said Order Form contemplated Cornerstone's purchase of $210,000.00 of accounts receivable for the purchase price of $200,000.00 ("Standard Goods First Order Form"). The second Order Form governed the second tranche of accounts receivable, and said Order Form contemplated Cornerstone's subsequent purchase of $210,000.00 of accounts receivable for the purchase price of $200,000.00 ("Standard Goods Second Order Form"). True, accurate, and complete copies of the Standard Goods First Order Form and the Standard Goods Second Order Form are attached hereto as Exhibit M.

120.   The due date for Standard Goods to remit full payment to Cornerstone for the Standard Goods First Order Form was September 22, 2019. The due date for Standard Goods to remit full payment to Cornerstone for the Standard Goods Second Order Form was September 29, 2019.

121.   Cornerstone performed its obligations under the Standard Goods Purchase Agreement by paying over to Standard Goods the purchase price for the

purchased accounts receivable.

122.    Standard Goods received payment from the account-debtors for the accounts receivable Cornerstone purchased.

123.    Kim was obligated under the Standard Goods Purchase Agreement in Kim's individual and personal capacity, as Kim agreed to sign as a personal guarantor of all obligations Standard Good agreed to under the Standard Goods Purchase Agreement.

124.    Cornerstone never received the purchased accounts receivable from Standard Goods, despite Cornerstone performing its obligations under the Standard Goods Purchase Agreement. Instead of remitting to Cornerstone the funds relating to the purchased accounts receivable, Standard Goods diverted the funds from Cornerstone and never fully satisfied its obligations to Cornerstone.

125.    Upon information and belief, Standard Goods diverted funds for the benefit of the Community, instead of using the funds for the purpose of generating additional revenue for Standard Goods to satisfy all obligations to Cornerstone.

126.    Taylor, the account manager for at least Auden, Rodem Tree, and Standard Goods, communicated that because of Cornerstone's assistance in funding, these three companies have donated over $1,500,000.00 to Christian charities. (Exhibit G).    Upon information and belief, the donations were directed to the Community.

127.    Standard Goods and Cornerstone entered into a settlement arrangement for Standard Goods to issue payment in two installments ("Standard Goods Settlement"). The first installment payment was due on April 15, 2021, and the second installment payment was due on April 30, 2021.

128.    Standard Goods issued payment on April 15, 2021, but failed to issue the second installment payment due on or by April 30, 2021.

129.    In the event of a default of the Standard Goods Settlement, the original amount owed would continue to be owed by Standard Goods to Cornerstone.

130.    After the allowance of all just and lawful offsets, payments, and credits to Standard Goods' account allowable under the Standard Goods Purchase Agreement, a balance of $2,084,271.30 remains due, unremitted, and owing.

### Standard Way & Hwang

131.    Standard Way is an online merchant selling goods.

132.    Ruby Hwang is the owner and operator of Standard Way.

133.    On or around March 12, 2019, Standard Way entered into a Master Agreement with Cornerstone ("Standard Way Purchase Agreement").

134.    Under the Standard Way Purchase Agreement, Cornerstone agreed to purchase accounts receivable from Standard Way, in exchange for Standard Way to pay over to Cornerstone said accounts receivable.

135.    Under the Standard Way Purchase Agreement, Standard Way granted

Cornerstone a security interest in all accounts, including without limitation, all deposit accounts, accounts receivable, and other receivables, chattel paper, documents, equipment, real estate, general intangibles, instruments, inventory, and proceeds of the foregoing, including all after-acquired collateral.

136.    Cornerstone performed its obligation under the Standard Way Purchase Agreement by paying over to Standard Way the purchase price for the purchased accounts receivable.

137.    Standard Way received payment from the account-debtors for the accounts receivable Cornerstone purchased. Standard Way has failed to fully pay over all accounts receivable purchased by Cornerstone.

138.    Ruby Hwang ("Hwang") was also obligated under the Standard Way Purchase Agreement in Hwang's individual and personal capacity, as Hwang agreed to sign as a personal guarantor of all obligations Standard Way agreed to under the Standard Way Purchase Agreement.

139.    Cornerstone has never received the full amount of the purchased accounts receivable from Standard Way, despite Cornerstone performing its obligations under the Standard Way Purchase Agreement. Upon information and belief, instead of remitting to Cornerstone all funds and interest payments relating to the purchase accounts receivable, Standard Way diverted the funds from Cornerstone and never satisfied its obligations to Cornerstone.

140.   Cornerstone and Standard Way entered into a settlement agreement, by which Standard Way agreed to pay Cornerstone in the amount of $167,406.68 by no later than April 30, 2021 ("Standard Way Settlement"). In the event that Standard Way failed to timely pay the agreed-upon amount to Cornerstone, then the full amount owed becomes due. Cornerstone was not timely paid the settlement amount.

141.   After the allowance of all just and lawful offsets, payments, and credits to Standard Way' account allowable under the Standard Way Purchase Agreement, a balance of $205,268.33 remains due, unremitted, and owing.

### Rodem Tree & Lee

142.   Rodem Tree is an online merchant purportedly dealing in goods relating to menswear and other clothing. Rodem Tree uses Amazon.com as its platform to sell goods.

143.   Lee is the owner and operator of Rodem Tree.

144.   Lee stated his residence as being 193 Dover Furnace Road, Dover Plains, New York 12522. The foregoing property is owned by WOA.

145.   On or around May 24, 2019, Rodem Tree entered into a Master Agreement with Cornerstone ("Rodem Tree Purchase Agreement"). A true, accurate, and complete copy of the Rodem Tree Purchase Agreement is attached hereto and made a part hereof as Exhibit N.

146.   Under the Rodem Tree Purchase Agreement, Cornerstone agreed to

purchase accounts receivable worth $105,000.00, which Rodem Tree was obligated to pay over to Cornerstone.

147.   Under the Rodem Tree Purchase Agreement, Rodem Tree granted Cornerstone a security interest in all accounts, including without limitation, all deposit accounts, accounts receivable, and other receivables, chattel paper, documents, equipment, real estate, general intangibles, instruments, inventory, and proceeds of the foregoing, including all after-acquired collateral.

148.   Cornerstone performed its obligation under the Rodem Tree Purchase Agreement by paying over to Rodem Tree the purchase price for the purchased accounts receivable.

149.   Upon information and belief, Rodem Tree received payment from the account-debtors for the accounts receivable Cornerstone purchased.

150.   Lee was also obligated under the Rodem Tree Purchase Agreement in Lee's individual and personal capacity, as Lee agreed to sign as a personal guarantor for all obligations Rodem Tree agreed to under the Rodem Tree Purchase Agreement.

151.   Cornerstone never received the purchased accounts receivable from Rodem Tree, despite Cornerstone performing its obligations under the Rodem Tree Purchase Agreement. Instead of remitting to Cornerstone the funds relating to the purchased accounts receivable, Rodem Tree diverted the funds from Cornerstone

and never satisfied its obligations to Cornerstone.

152.   Upon information and belief, Rodem Tree diverted funds for the benefit of the Community, instead of using the funds for the purpose of generating additional revenue for Rodem Tree to satisfy all obligations owed to Cornerstone.

153.   Taylor, the account manager for Auden, Rodem Tree, and Standard Goods, communicated that because of Cornerstone's assistance in funding, these three companies have donated over $1,500,000.00 to Christian charities. (Exhibit G).  Upon information and belief, the donations were made to the Community.

154.   Cornerstone negotiated a settlement with Rodem Tree and Lee for Cornerstone to receive payment in lieu of litigation. Lee, on behalf of Rodem Tree, entered into a settlement agreement titled: "Settlement and Resolution Agreement," on April 14, 2021 ("Rodem Tree Settlement"). A true, accurate, and complete copy of the Rodem Tree Settlement is attached hereto as Exhibit O.

155.   In the Rodem Tree Settlement, Lee stipulated that as of April 14, 2021, that under the Rodem Tree Purchase Agreement, the amount owed to Cornerstone was $670,609.31. Cornerstone agreed to accept $648,554.07. The foregoing settlement amount was to be paid by Lee and Rodem Tree in two installments, with the first being due on April 15, 2021, and the second on April 31, 2021. The settlement agreement required that if the settlement amount was not paid, then the original, non-negotiated amount owed becomes due.

156.   Rodem Tree and Lee failed to make timely payments pursuant to the Rodem Tree Settlement Agreement.

157.   After the allowance of all just and lawful offsets, payments, and credits to Rodem Tree's account allowable under the Rodem Tree Purchase Agreement, a balance of $779,987.50 remains due, unremitted, and owing.

**Olivet University & Lin**

158.   Olivet University is a nonprofit corporation that purportedly provides faith-based collegiate and higher education. Olivet University is primarily based in Anza, California, but has several satellite campuses: San Francisco, California; Washington, D.C.; St. Louis, Missouri; Nashville, Tennessee; and Orlando, Florida.

159.   Previously, Olivet University operated a large satellite campus in Dover, New York.  In 2022, the New York State Education Department refused to renew Olivet University's permit to continue operating in New York as an academic institution providing educational services.[5] The refusal was on the basis of financial mismanagement by Olivet University.

160.   Olivet University has undergone recent scrutiny from the State of California. In December 2024, the Bureau for Private Postsecondary Education for the State of California revoked Olivet University's authority to operate as a

---

[5]      https://www.poughkeepsiejournal.com/story/news/local/2022/07/07/olivet-university-in-dover-ordered-closed-whats-next-for-campus/65367711007/.

36

postsecondary education institution and further directed Olivet University to cease enrollment and prepare a strategy to direct all currently enrolled students to obtain degrees from alternative institutions.[6]

161.   The Bureau specifically issued a Decision and Order after hearing testimony from Olivet University and conducting an investigation, which involved visits to Olivet University's main campus. The investigation found empty dormitories and classrooms, one classroom had five students, and classrooms that were scheduled to have classes were without faculty members. Furthermore, the investigation discovered the absence of documents pertaining to the students, and, Dr. Jonathan Park—the President of Olivet University at the time—testified that students do not pay tuition.

162.   Notwithstanding the absence of students and the lack of any tuition payments, Olivet University informed the IRS in its 2023 tax filing that it generated $14,000,000.00 in revenue and had $85,000,000.00 in assets.[7]

163.   The Merchant Defendants and Principals are connected with Olivet University. By way of examples and without exclusion: Ko serves as a music professor at Olivet University,[8] Chiu serves as the Director of the Finance

---

[6] https://www.bppe.ca.gov/enforcement/actions/20241211_olivet_university.pdf.
[7] https://projects.propublica.org/nonprofits/organizations/200909475.
[8] https://www.olivetuniversity.edu/english/.

Committee at Olivet University,[9] and Lin has served (and, upon information and belief, continues to serve) as the Chairman of the Board of Trustees of Olivet University.[10] Furthermore, (1) Olivet University owns the property Ko listed as her residence in the Pleros Purchase Agreement; and (2) Olivet University owns the property Haman listed as his residence in the Quba.pro Purchase Agreement.

164.   In 2018, Lin, while serving as Chairman of the Board of Olivet University, has been previously charged for wire fraud by fraudulently obtaining $25,000,000.00 in the name of Olivet University and laundered the money to continue funding Olivet University's operations. Funds were used to acquire property in the State of New York, including, a very large complex that was formerly known as the Harlem Valley Psychiatric Center and twenty-three (23) other nearby properties.[11]

165.   Upon information and belief, Lin serves as the Chairman of the Board of Olivet University.

166.   Olivet University entered into a Master Agreement with Cornerstone ("Olivet Purchase Agreement"). A true, accurate, and complete copy of the Olivet Purchase Agreement is attached hereto and made a part hereof as Exhibit P.

---

[9] https://www.linkedin.com/in/anthony-chiu-2775467.
[10]   https://nypost.com/2018/11/15/university-with-ties-to-newsweek-added-to-das-indictment/.
[11]   https://nypost.com/2018/11/15/university-with-ties-to-newsweek-added-to-das-indictment/.

167.    Under the Olivet Purchase Agreement, Cornerstone agreed to purchase accounts receivable worth $262,500.00 ("First Olivet Tranche"), which Olivet University was obligated to pay over to Cornerstone.

168.    Additionally, Cornerstone agreed to purchase additional accounts receivable worth $262,500.00 ("Second Olivet Tranche"), which Olivet University obligated to pay over to Cornerstone.

169.    Olivet University represented to Cornerstone that it had over $30,000,000.00 worth of accounts receivable generated in Olivet University's ordinary course of business.

170.    Under the Olivet Purchase Agreement, Olivet University granted Cornerstone a security interest in all accounts, including without limitation, all deposit accounts, accounts receivable, and other receivables, chattel paper, documents, equipment, real estate, general intangibles, instruments, inventory, and proceeds of the foregoing, including all after-acquired collateral.

171.    Cornerstone performed its obligation under the Olivet Purchase Agreement by paying over to Olivet University the purchase price for the purchased accounts receivable.

172.    Upon information and belief, Olivet University received payment from the account-debtors for the accounts receivable purchased by Cornerstone. However, Olivet University has failed to remit the payment thereof to Cornerstone, per the

requirements of the Olivet Purchase Agreement.

173.   Lin was also obligated under the Olivet Purchase Agreement in Lin's individual and personal capacity, as Lin agreed to sign as a personal guarantor of all obligations Olivet University agreed to under the Olivet Purchase Agreement.

174.   Cornerstone never fully and timely received the purchased accounts receivable from Olivet University for either the First Olivet Tranche or the Second Olivet Tranche, despite Cornerstone performing its obligations under the Olivet Purchase Agreement. Instead of remitting to Cornerstone the funds relating to the purchased accounts receivable, Olivet University diverted the funds from Cornerstone and never satisfied its obligations to Cornerstone.

175.   Upon information and belief, Olivet University diverted the funds for the benefit of the Community, instead of using the funds for the purpose of generating additional revenue for Olivet University to satisfy all obligations owed to Cornerstone, as agreed to in the Olivet Purchase Agreement.

176.   Upon information and belief, Olivet University diverted Cornerstone's purchase price and the funds paid by the account-debtors to purchase real property for the Community.

177.   Lin executed a confession of judgment on January 1, 2018 ("Lin's First Confession of Judgment"), by which he confessed and authorized the entry of judgment against Lin and Olivet University, jointly and severally, in the amount of

$262,500.00 plus simple interest thereon at the annual rate of twelve percent (12%) from the time of breach, along with all costs and attorney's fees, with said attorney's fees being calculated at twenty-five percent (25%) of the total sum owed to Cornerstone due to Olivet University's breach of the Olivet Purchase Agreement for the First Olivet Tranche. A true, accurate, and complete copy of Lin's First Confession of Judgment is attached hereto as Exhibit Q.

178. Anderson notarized Lin's First Confession of Judgment. Upon information and belief, Anderson apprised Lin and Olivet University of the rights, duties, and obligations incurred by executing Lin's First Confession of Judgment.

179. Lin executed a confession of judgment on January 8, 2019 ("Lin's Second Confession of Judgment"), by which he confessed and authorized the entry of judgment against Lin and Olivet University, jointly and severally, in the amount of $262,500.00 plus simple interest thereon at the annual rate of twelve percent (12%) from the time of breach, along with all costs and attorney's fees with said attorney's fees being calculated at twenty-five percent (25%) of the total sum owed to Cornerstone due to Olivet University's breach of the Olivet Purchase Agreement for the Second Olivet Tranche. A true, accurate, and complete copy of Lin's Second Confession of Judgment is attached hereto as Exhibit R.

180. Anderson notarized Lin's Second Confession of Judgment. Upon information and belief, Anderson apprised Lin and Olivet University of the rights,

duties, and obligations incurred by executing Lin's Second Confession of Judgment.

181.   Based on the foregoing calculation provided under Lin's First Confession of Judgment and Lin's Second Confession of Judgment, Olivet University and Lin, jointly and severally, owe Cornerstone in an amount to be determined at trial.

### WOA & Chiu

182.   WOA is a nonprofit corporation formed under the laws of New York.

183.   Mark Spisak ("Spisak"), who upon information and belief, is also referred to as Marian Spisak,[12] serves as the executive director of WOA.

184.   As part of its operations, WOA owns at least some of the Community's real property in New York. Attached hereto is Exhibit S, which provides all addresses and parcel numbers currently owned by WOA in New York.

185.   Chiu is the owner and operator of WOA.

186.   Chiu is also intimately tied in with Olivet University. Chiu serves as the Director of the Finance Committee at Olivet University. Furthermore, Chiu serves as a pastor of a presbyterian church in St. Louis, Missouri, which is connected to WOA and Olivet University, or, in other words, the Community.[13]

---

[12] https://www.newsweek.com/olivet-assembly-chief-mark-spisak-under-scrutiny-money-laundering-probe-1768468.
[13]   https://fox4kc.com/news/problem-solvers/religious-university-without-students-on-campus-raises-questions-in-missouri-city/.

187.   On or around January 31, 2019, WOA entered into a Master Agreement with Cornerstone ("WOA Purchase Agreement"). A true, accurate, and complete copy of the WOA Purchase Agreement is attached hereto and made a part hereof as Exhibit T.

188.   Under the WOA Purchase Agreement, Cornerstone agreed to purchase accounts receivable worth $315,000.00, which WOA was obligated to pay over to Cornerstone. WOA was obligated under the WOA Purchase Agreement to deposit the funds into a bank account, of which Cornerstone had access to.

189.   In the WOA Purchase Agreement, WOA represented that it generates approximately $17,000,000.00 worth of accounts receivable in its ordinary course of business.

190.   Under the WOA Purchase Agreement, WOA granted Cornerstone a security interest in all accounts, including without limitation, all deposit accounts, accounts receivable, and other receivables, chattel paper, documents, equipment, real estate, general intangibles, instruments, inventory, and proceeds of the foregoing, including all after-acquired collateral.

191.   Cornerstone performed its obligations under the WOA Purchase Agreement by paying over to WOA the purchase price for the purchased accounts receivable.

192.   Upon information and belief, WOA received payment from the

account-debtors for the accounts receivable Cornerstone purchased.

193.    Chiu was also obligated under the WOA Purchase Agreement in Chiu's individual and personal capacity, as Chiu agreed to sign as a personal guarantor for all obligations WOA agreed to under the WOA Purchase Agreement.

194.    Cornerstone never fully and timely received the purchased accounts receivable from WOA, despite Cornerstone performing its obligations under the WOA Purchase Agreement. Instead of remitting to Cornerstone the funds relating to the purchased accounts receivable, WOA diverted the funds from Cornerstone and never satisfied its obligations to Cornerstone.

195.    Upon information and belief, WOA diverted the funds for the benefit of the Community, instead of using the funds for the purpose of generating additional revenue for WOA to satisfy all obligations to Cornerstone, as agreed to in the WOA Purchase Agreement.

196.    WOA, under the control of Chiu, acquired real estate cumulatively worth $2,750,000 in Sanford, Florida in 2020, since Chiu and WOA entered into the Agreement, despite refusing to pay Cornerstone.

197.    Chiu executed a confession of judgment on February 8, 2019 ("Chiu's Confession of Judgment"), by which he confessed and authorized the entry of judgment against Chiu and WOA, jointly and severally, in the amount of $315,000.00 plus simple interest thereon at the annual rate of twelve percent (12%)

from the time of breach, along with all costs and attorney's fees, with said attorney's fees being calculated at twenty-five percent (25%) of the total sum owed to Cornerstone, which includes, but is not limited to, the balance owed to Cornerstone and attorney's fees incurred by Cornerstone because of WOA's breach of the WOA Purchase Agreement. A true, accurate, and complete copy of WOA's Confession of Judgment is attached hereto as Exhibit U.

198.    Anderson notarized Chiu's Confession of Judgment. Upon information and belief, Anderson apprised Chiu and WOA of the rights, duties, and obligations incurred by executing Chiu's Confession of Judgment.

199.    WOA has not made any partial payments pursuant to the WOA Purchase Agreement.

200.    Based on the foregoing calculation provided under Chiu's Confession of Judgment, Chiu and WOA, jointly and severally, owe Cornerstone in an amount to be determined at trial.

***The Merchant Defendants, The Principals, and the Enterprise***

201.    For ease of reference, the Pleros Purchase Agreement, the Auden Purchase Agreement, the Quba.pro Purchase Agreement, the Standard Goods Purchase Agreement, the Standard Way Purchase Agreement, the Rodem Tree Purchase Agreement, the Olivet Purchase Agreement, and the WOA Purchase Agreement are hereinafter collectively referred to as the "Purchase Agreements."

45

202.   The Merchant Defendants and Principals are interconnected and involved with the Community, which is a religious sect. The religious sect also operates globally through WOA, with Olivet Assembly USA operating as the national entity for North America. Beneath the umbrella of Olivet Assembly USA, several businesses and organizations own real property and circulate funds and personnel between themselves. Upon information and belief, other para-organizations may exist that also assist in operating the Community.

203.   Olivet Assembly USA connects the Community with two universities other than Olivet University, namely—Jubilee University and the Great Commission University. Furthermore, Olivet Assembly USA's website highlights affiliated ministries, organizations, and universities that operate in North America.[14]

204.   Jubilee University is a nonprofit corporation purporting to operate a university fixated on teaching music and related arts at 1880 Washington Avenue, Lexington, Missouri 64067. According to recent tax records, upon information and belief, Jubilee World, Inc. is the listed owner of the foregoing property.

205.   As recent as November 1, 2024, Jubilee University has not had any students on-campus. Rather, upon information and belief, Jubilee University has approximately thirty (30) students who attend class online and, notably, do not pay tuition.

---

[14] https://olivetassembly.org/.

206.   The purported president and current board member of the Board of Directors of Jubilee University, Marcus Lundin, stated that the funds to pay for the facilities and property for Jubilee University come from "church members around the United States who own businesses."[15] Upon information and belief, the Community funds Jubilee University.

207.   Upon information and belief, the mail being sent to Jubilee University is directed to a nearby church—Immanuel Community Church, which is pastored by Anthony Chiu.[16]

208.   Great Commission University is a new addition to the Community, as the university was started in May 2020. Great Commission University is located at 5755 IN-9, Howe, Indiana 46746. The foregoing property was purchased on July 14, 2020, as made available by the public tax records. The total purchase price was $2,988,200. Around a year later, WOA fully paid off the loan Great Commission University obtained to purchase the property.[17] Great Commission University had its first graduating class—with only one student graduating—in 2022.[18]

209.   According to the most up-to-date information from the Tax Assessor of

---

[15]   https://fox4kc.com/news/problem-solvers/religious-university-without-students-on-campus-raises-questions-in-missouri-city/.

[16] https://stlimmanuel.org/about-us/who-we-are/.

[17] https://www.kpcnews.com/newssun/article_b2fd8719-72af-58b7-a3e4-56a7c455bd70.html.

[18] https://gcu.education/great-commission-university-holds-first-commencement-with-abundant-grace-and-joy/.

LaGrange County, Indiana, WOA owns the real property Great Commission University uses.

210.   Haman, one of the named Principals and defendants herein, formerly served as the Executive Director of Great Commission University and now serves as the Assessments and Publications Coordinator. According to available tax records for 2021, Haman's wife, Sharon Haman, served as the Treasurer of Great Commission University.

211.   According to a 2024 tax filing by Great Commission University, Chiu serves as the Chairman of the Board for Great Commission University.[19]

212.   Aside from the universities, upon information and belief, the Community uses various business entities to circulate money and purchase real estate. These entities include, but are not limited to, Dover Greens, Jubilee World, First Estates, 7725 Penrose, Good Manager, and Christian Innovation Center LLC.

213.   Dover Greens is a limited liability company that is duly formed under the laws of Delaware and registered to do business as a foreign entity in the State of New York.

214.   Dover Greens owns extensive amounts of real property in New York and operates the facilities thereon.

215.   According to a 2022 tax filing by Olivet University, Dover Greens is a

---

[19] https://projects.propublica.org/nonprofits/organizations/851562918.

related entity that is directly controlled by Olivet University. According to the 2022 tax filing, Dover Greens had an annual income of $2,064,823.[20] Furthermore, as of the date of this filing, Olivet University serves as the registered agent for Dover Greens in New York.

216.    Upon information and belief, funds obtained by the Merchant Defendants and Principals from Cornerstone ultimately flowed, at least in part, to Dover Greens.

217.    On October 30, 2024, Dover Greens plans to create a multi-facility construction project located at properties owned by Dover Greens in New York.

218.    Also, according to a 2022 tax filing by WOA, Christian Innovation Center LLC, which is a limited liability company formed in Washington, D.C., is a related entity. Furthermore, the registered agent for Christian Innovation Center LLC, Samuel Kim, is the director for the journalism program at Olivet University.[21]

219.    According to public tax records made available by the Washington D.C. Tax Commissioner, Christian Innovation Center LLC purchased real property in Washington D.C. for $11,000,000.00 in 2019, occurring around the same time as when the Merchant Defendants and Principals executed Purchase Agreements.

---

[20] https://projects.propublica.org/nonprofits/organizations/200909475/202441629349301524/full
[21]        https://library.staging.olivetuniversity.edu/news/2005/12/21/134/olivet-university-olivet-expands-media-library-resources.html.

220.    Another business, 7725 Penrose, a limited liability company formed under the laws of Pennsylvania, owns real estate for the Community. According to a 2022 tax filing by WOA, 7725 Penrose is an associated entity with WOA, and held assets in the amount of $2,871,795, by the end of 2022.[22] This total is largely comprised of 7725 Penrose's acquisition of the real property located at 7725 Penrose Avenue, Elkins Park, Pennsylvania on December 11, 2020, for $3,000,000.00.

221.    First Estates, is a limited liability company formed under the laws of Florida, is managed by Spisak. First Estates recently purchased the real property located at 1000 East First Street, Sanford, Florida 32771, and 1080 East First Street, Sanford, Florida 32771. The foregoing properties were purchased by First Estates on April 13, 2022, for $6,000,000.00. Spisak stated that the foregoing properties would become WOA's southern headquarters.[23]

222.    All conditions precedent have occurred or been performed.

223.    For ease of reference, Olivet Assembly USA, Jubilee University, Great Commission University, Dover Greens, Jubilee World, First Estates, and Christian Innovation Center LLC, Quba.pro, and Good Manager are hereinafter referred to as the "Community Entities."

---

[22] https://projects.propublica.org/nonprofits/organizations/461616553/2023234993
49301362/full.
[23]                      https://www.yahoo.com/news/christian-group-plan-sanford-historic-
173500951.html.

# IV.    CAUSES OF ACTION

**Count One – Racketeering Influence and Corrupt Organizations Act**

**(18 U.S.C. § 1964(c))**

**(All Defendants)**

224.    Cornerstone incorporates by reference all previous and subsequent paragraphs of this Complaint as if fully set forth herein, verbatim.

225.    The Merchant Defendants, Principals, and Community Entities are persons as defined by 18 U.S.C. § 1961, as they are either individuals or entities capable of holding a legal or beneficial interest in property.

226.    The Merchant Defendants, Principals, and Community Entities operate together to circulate funds ultimately for the benefit of the Community.

227.    The Merchant Defendants, Principals, and Community Entities share the common goal of funding the Community and its para-organizations, through the pattern of racketeering activity as fully explained below.

228.    Upon information and belief, WOA and Olivet Assembly USA control the actions of the Merchant Defendants, Principals, and the Community Entities and any and all other para-organizations associated with the Community.

229.    Therefore, the Merchant Defendants, Principals, and Community Entities constitute an association-in-fact enterprise (the "Enterprise"), which held a common purpose to financially support WOA and the Community through illegal

wire fraud.

230.   Since at least 2019, the Merchant Defendants, and, upon information and belief, for much longer for certain members of the Enterprise, have engaged in conduct including wire fraud, money laundering, and related conduct through their various entities to channel funds and resources to advance the Community.

231.   The members of the Enterprise have ongoing relations with each other through common business ownership or operation; shared personnel, office space, and real property ownership; and membership in the same religious organization.

232.   The conduct perpetuated herein by the Enterprise constitutes "fraud by wire" within the meaning of 18 U.S.C. § 1343, which is a "racketeering activity" defined in 18 U.S.C. § 1961(1).

233.   The repeated and continuous use of these unlawful actions and conduct by the Enterprise constitutes a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

234.   The members of the Enterprise acted in concert and worked toward the common purpose of funding the Community and its associated "arms" by defrauding Cornerstone and transferring the funds throughout the organization.

235.   The manner by which WOA and the Community received funding involves wire fraud with the intent to defraud Cornerstone for the benefit of the Enterprise and the Community.

236.  The Enterprise engaged in a scheme to defraud Cornerstone and enrich itself by taking funds paid over by Cornerstone pursuant to the Purchase Agreements and, upon information and belief, transfer said funds through wire transfers to associated entities.

237.  This scheme was intended to and did enrich the Community and all associated entities to the direct detriment of Cornerstone.

238.  Upon information and belief, the transferred funds were transferred across state lines and through the stream of interstate commerce.

239.  The Enterprise members routinely engage in and utilize the instrumentalities of interstate commerce in daily business activities.

240.  Members of the Enterprise maintain office space in California, Missouri, New York, and other locations throughout the United States and engage with others, including Cornerstone, through interstate email, wire transfers, and bank transactions through automated clear houses.

241.  The Defendant Merchants and Principals, who directly contacted Cornerstone, made representations to Cornerstone that the Defendant Merchants and Principals had more than the necessary capital to pay Cornerstone over its accounts receivable, then committed fraud by misrepresenting the company statuses of the Defendant Merchants, Principals, and their financial statuses to Cornerstone.

242.  Rather than paying over the full amount of the funds belonging to

Cornerstone, the Merchant Defendants and Principals, upon information and belief, directed funds, including the purchase prices Cornerstone paid, to the Community for the Community's acquisition and development of real property.

243.   This scheme furthers the Community's purpose of acquiring and developing real property.

244.   The transferred funds were part of the scheme formulated by the Enterprise to defraud Cornerstone and enrich the Community.

245.   The Enterprise, through the Defendant Merchants and Principals, specifically engaged Cornerstone for the purpose of inducing Cornerstone to provide funds and services.

246.   Upon information and belief, each member of the Enterprise proceeded to take the funds received from Cornerstone and transferred said funds to the Community Entities, and, ultimately to the Community to fund its operations, which includes, but is not limited to, purchasing and developing real estate in the United States. Each instance constitutes a predicate act.

247.   Cornerstone is not the only business that has alleged a RICO violation on the basis of wire fraud against Olivet University and WOA. In 2023, 8Fig filed an action against many entities tied to Olivet University and WOA, which exposed the web of entities that circulate funds, personnel, and property for the betterment of the Community. *See 8Fig, Inc. v. Stepup Funny, LLC*, 1:23-CV-00943-DII (W. Tx.

Div. 2023).

248.    While each member of the Enterprise has a history in the above-styled case of wire fraud, *8Fig, Inc.* includes some of the same defendants and alleges against said defendants the same criminal activity Cornerstone is alleging, which reveals history and patterns of racketeering activity for the benefit of the same Community.

249.    Cornerstone has and continues to be injured in its business and property due to the Enterprise's violation of 18 U.S.C. § 1962(c) in an amount to be determined at trial but likely in excess of $8,653,596.63.

250.    The injuries to Cornerstone directly, proximately, and in a reasonably foreseeable manner, resulted from or were caused by the violations of 18 U.S.C. 1962(c)-(d) and include the transferred funds which were improperly transferred throughout the Enterprise's members.

251.    Cornerstone also incurred damages from attorney's fees and costs associated with investigating and prosecuting the Defendants' unlawful conduct.

252.    Pursuant to 18 U.S.C. § 1964(d), Cornerstone is entitled to treble damages.

253.    Therefore, due to Defendants' scheme, Cornerstone suffered damages in excess of $8,653,596.63 and as further shown at trial plus treble damages, attorney's fees, pre- and post-judgment interest, and court costs and expenses.

## Count Two – Conspiracy (18 U.S.C. § 1962(d) and Common Law)

## (All Defendants)

254.   Cornerstone incorporates by reference all previous and subsequent paragraphs of this Complaint as if fully set forth herein, verbatim.

255.   The Merchant Defendants, Principals, and Community Entities conspired together to commit wire fraud for the purpose of enriching the Community at the direct expense of Cornerstone.

256.   Upon information and belief, the Enterprise's members agreed to and acted in concert to commit multiple acts of wire fraud.

257.   The Enterprises' actors involved were aware of the conspiracy and knew of the other participants.

258.   The Enterprises' actors consciously and purposely engaged in conduct and intended to engage in conduct related to the furtherance of the predicate acts, namely, the wire fraud.

259.   Because of the foregoing, Cornerstone was injured and suffered damage to its business and property in an amount to be determined at trial.

## Count Three – Civil Conspiracy

## (All Defendants)

260.   Cornerstone incorporates by reference all previous and subsequent paragraphs of this Complaint as if fully set forth herein, verbatim.

261.   The Merchant Defendants, Principals, and Community Entities conspired together to commit wire fraud for the purpose of enriching the Community at the cost of Cornerstone.

262.   The Merchant Defendants, Principals, and Community Entities had a meeting of the minds to fund the Community and utilize Cornerstone's funds to finance the Community. The Merchant Defendants, Principals, and Community Entities agreed to commit multiple acts of wire fraud, money and had received, and unlawful acts, as further detailed in this Complaint.

263.   Because of the foregoing, Cornerstone was injured and suffered damage to its business and property in an amount to be determined at trial.

## Count Four – Fraud

## (All Defendants)

264.   Cornerstone incorporates by reference all previous and subsequent paragraphs of this Complaint as if fully set forth herein, verbatim.

265.   The Merchant Defendants and Principals represented to Cornerstone that the Merchant Defendants generated substantial accounts receivable that far exceeded the amount of accounts receivable purchased by Cornerstone.

266.   The Merchant Defendants and Principals represented to Cornerstone in the Purchase Agreement that the Merchant Defendants would use the purchase prices paid over by Cornerstone for the benefit of the Merchant Defendants'

businesses to generate greater revenue. In an email to Nick Logan ("Logan"), the principal of Cornerstone, Turner, the accounts manager for Auden Lily, Rodem Tree, and Standard Goods, informed Logan that Cornerstone's purchase of accounts receivable allowed Auden Lily, Rodem Tree, and Standard Goods to generate substantial accounts receivable. The resulting additional revenue stream allowed Auden Lily, Rodem Tree, and Standard Goods to make an additional donation of $1,500,000.00 to domestic and international evangelism and second generation Christian education. Turner's email came on or around October 11, 2019, when Auden Lily offered Cornerstone additional accounts receivable for purchase. (Exhibit G).

267.    The Merchant Defendants and Principals communicated to Cornerstone that they generated sufficient accounts receivable.

268.    When Cornerstone contacted the Merchant Defendants and Principals regarding the overdue payments, Cornerstone worked with Lin and negotiated settlement agreements for Pleros, Quba.pro, and Rodem Tree. Lin misrepresented to Cornerstone that Pleros and Rodem Tree had sufficient funds to pay over the negotiated amounts and would timely pay over the negotiated amounts. Pleros and Rodem Tree defaulted on their settlements with Cornerstone.

269.    The Merchant Defendants and Principals entered into the Purchase Agreements with the full knowledge that: (1) they did not have the represented

amount of accounts receivable; and (2) they did not intend on using the purchase prices paid over by Cornerstone pursuant to the Purchase Agreements to generate further revenue for the Merchant Defendants.

270. The Merchant Defendants and Principals intended to induce Cornerstone's reliance on the promises surrounding and contained within the Purchase Agreements to ensure Cornerstone pays over the purchase prices.

271. Cornerstone justifiably relied on Merchant Defendants and Principals promises, as the Principals and, specifically Lin, assured Cornerstone of payment. Furthermore, the Merchant Defendants provided Cornerstone with documents indicating that their accounts receivable far exceeded the amount of accounts receivable purchased by Cornerstone. Examples include, but are not limited to, the Olivet University Purchase Agreement, Rodem Tree Purchase Agreement, and the WOA Purchase Agreement. Additionally, an application detailing Standard Goods' financial position to Cornerstone represented that Standard Goods has annual sales amounting to $3,000,000.00. A true, accurate, and complete copy of the application is attached hereto as Exhibit V.

272. Because Cornerstone reasonably and justifiably relied on the Merchant Defendants and Principals' fraudulent representation, Cornerstone has suffered injured and extensive damages, which includes the purchase prices that Cornerstone remitted to the Merchant Defendants and Principals, along with the accounts

receivable that Cornerstone purchased.

## Count Five – Violation of California's Unfair Competition Law (UCL)

### (Merchant Defendants & Principals)

273.    Cornerstone incorporates by reference all previous and subsequent paragraphs of this Complaint as if fully set forth herein, verbatim.

274.    The Merchant Defendants and Principals engaged in fraudulent business practices that deceived the public.

275.    The Merchant Defendants and Principals represented to Cornerstone that each of the Merchant Defendants generated substantial accounts receivable in the ordinary course of business that far exceeded the amount of worth of the accounts receivable purchased by Cornerstone.

276.    The Merchant Defendants and Principals also represented to Cornerstone that the purchase prices paid over by Cornerstone to the Merchant Defendants pursuant to the Purchase Agreements would be used solely for the purpose of generating income for the Merchant Defendants to ensure Cornerstone is paid back.

277.    Despite the Merchant Defendants and Principals' representations, the Merchant Defendants and Principals defrauded Cornerstone by entering the Purchase Agreements containing the foregoing representations with the intention of never fully paying over to Cornerstone the accounts receivable once paid or, in some

cases, representing the existence of accounts receivable when the accounts receivable did not, in fact, exist.

278.   The Merchant Defendants and Principals misled Cornerstone by representing that Merchant Defendants and Principals generated more the sufficient accounts receivable to remit payment to Cornerstone in the full amount owed Cornerstone.

279.   The Merchant Defendants and Principals' conduct likely deceives the public. As noted above, other third parties, such as 8Fig, Inc., entered into a similar arrangement as Cornerstone with some of the same Merchant Defendants, and, ultimately, filed a lawsuit against the same Merchant Defendants on allegations of fraud. *See 8Fig, Inc. v. Stepup Funny, LLC*, 1:23-CV-00943-DII (W. Tx. Div. 2023).

280.   Because of the foregoing, Cornerstone was injured and suffered damage to its business and property in an amount to be determined at trial.

## Count Six – Breach of Contract

## (Pleros, Auden, Standard Goods, Standard Way, Rodem Tree, Lee, Kim, Ko, Osorio, Hwang, & Yim)

281.   Cornerstone incorporates by reference all previous and subsequent paragraphs of this Complaint as if fully set forth herein, verbatim.

282.   The Purchase Agreements constitute valid and enforceable contracts between Cornerstone, the Merchant Defendants, and the Principals. Cornerstone

performed its obligations under each of the Purchase Agreements by paying over the purchase price for the accounts receivable, and said payments were received by the Merchant Defendants.

283.    Cornerstone offered and tendered all other required performance obligations under the Purchase Agreements.

284.    The Merchant Defendants and Principals breached and defaulted on their obligations under the respective Purchase Agreements.

285.    Upon information and belief, instead of utilizing the purchase price paid by Cornerstone to the Merchant Defendants for the benefit of the Merchant Defendants' businesses to generate further revenue, the Merchant Defendants, controlled by Principals, proceeded to circulate the funds to the Community.

286.    Upon information and belief, the Merchant Defendants and Principals breached the Purchase Agreements by failing to fully remit to Cornerstone all amounts received in connection with the accounts receivable purchased by Cornerstone in the Purchased Agreements.

287.    In an attempt to avoid litigation over the breached agreements, on or around April 15, 2021, Cornerstone entered into settlements with Pleros and Ko, Auden and Osorio, Standard Way and Hwang, and Rodem Tree and Lee.

288.    The Pleros Settlement required the settlement amount to be paid in two installments. The first payment being due April 15, 2021, and the second being due

April 30, 2021.

289.   Pleros issued the first installment payment on April 15, 2021, but failed to pay on April 30, 2021, resulting in a default of the Pleros Settlement occurring on or around April 30, 2021.

290.   The Auden Settlement required the settlement amount to be paid in two installments. The first payment being due April 15, 2021, and the second being due April 30, 2021.

291.   Auden issued the first installment payment on April 15, 2021, but failed to pay on April 30, 2021, resulting in a default of the Auden Settlement occurring on or around April 30, 2021.

292.   The Standard Goods Settlement required the settlement amount to be paid in two installments. The first payment being due April 15, 2021, and the second being due April 30, 2021.

293.   Standard Goods issued the first installment payment on April 15, 2021, but failed to pay on April 30, 2021, resulting in a default of the Standard Goods Settlement occurring on or around April 30, 2021.

294.   The Standard Way Settlement required that Standard Way issue payment to Cornerstone in the amount of $167,406.88 by or on April 30, 2021.

295.   Standard Way failed to submit full payment by April 30, 2021, resulting in a default of the Standard Way Settlement occurring on or around April 30, 2021.

296.    The Rodem Tree Settlement required the settlement amount to be paid in two installments. Rodem Tree provided did not submit timely payment but only submitted a partial payment in connection with the Rodem Tree Settlement on or around June 2, 2021.

297.    Rodem Tree defaulted on the Rodem Tree Settlement by failing to perform its obligations in timely paying the full amount owed to Cornerstone.

298.    As a result, Cornerstone has suffered damages in the total amount of $8,653,596.63, which represents the amount owed pursuant to the respective purchase agreements and settlement agreements.

299.    Cornerstone additionally seeks recovery of post-judgment interest as allowed by law.

### Count Seven – Breach of Contract

### (Olivet University & Lin)

300.    Cornerstone incorporates by reference all previous and subsequent paragraphs of this Complaint as if fully set forth herein, verbatim.

301.    Cornerstone and Olivet University entered into the Olivet Purchase Agreement.

302.    Upon information and belief, Olivet University received payment from the account-debtors for the accounts receivable purchased by Cornerstone under the First Olivet Tranche and the Second Olivet Tranche.

303.    Olivet University failed to remit full payment to Cornerstone for all the accounts receivable purchased by Cornerstone.

304.    Lin executed Lin' First Confession of Judgment and Lin's Second Confession of Judgment, thereby agreeing that Olivet University and Lin are jointly and severally responsible for the First Olivet Tranche and the Second Olivet Tranche.

305.    Based on Lin's First Confession of Judgment and Lin's Second Confession of Judgment, Olivet and Lin, jointly and severally, owe Cornerstone in an amount to be shown at trial.

### Count Eight – Breach of Contract

### (WOA & Chiu)

306.    Cornerstone incorporates by reference all previous and subsequent paragraphs of this Complaint as if fully set forth herein, verbatim.

307.    Cornerstone and WOA entered into the WOA Purchase Agreement.

308.    Upon information and belief, WOA received payment from the account-debtors for the accounts receivable purchased by Cornerstone under the WOA Purchase Agreement.

309.    WOA failed to remit full payment to Cornerstone for all the accounts receivable purchased by Cornerstone.

310.    Chiu executed Chiu's Confession of Judgment, thereby agreeing that

65

Chiu and WOA are jointly and severally for payment of the accounts receivable purchased by Cornerstone under the WOA Purchase Agreement in the event that WOA breaches the WOA Purchase Agreement.

311.    WOA defaulted under the WOA Purchase Agreement.

312.    Based on Chiu's Confession of Judgment, WOA and Chiu, jointly and severally, owe Cornerstone in an amount to be shown at trial.

## Count Nine – Money Had and Received

## (Pleros, Auden, Standard Goods, Standard Way, Rodem Tree, Olivet University, WOA, Lee, Kim, Ko, Osorio, Hwang, Chiu, & Lin)

313.    Cornerstone incorporates by reference all previous and subsequent paragraphs of this Complaint as if fully set forth herein, verbatim.

314.    Cornerstone is the only party entitled to all funds received for all accounts receivable purchased under the Purchase Agreements.

315.    Article I, Paragraph 1 of the Purchase Agreements effectively transferred the Merchant Defendants and Principals' "full and complete ownership" of the purchased accounts receivable to Cornerstone.

316.    Upon information and belief, the Merchant Defendants received the funds paid by the account-debtors for the accounts receivable purchased by Cornerstone.

317.    Despite entering the Pleros Purchase Agreement, Pleros and Ko refused

to pay over to Cornerstone the accounts receivable purchased by Cornerstone.

318.   Despite entering the Auden Purchase Agreement, Auden and Osorio refused to pay over to Cornerstone the accounts receivable purchased by Cornerstone.

319.   Despite entering the Standard Goods Purchase Agreement, Standard Goods and Kim refused to pay over to Cornerstone the accounts receivable purchased by Cornerstone.

320.   Despite entering the Standard Ways Purchase Agreement, Standard Ways and Hwang refused to pay said funds over to Cornerstone.

321.   Despite entering the Rodem Tree Purchase Agreement, Rodem Tree and Lee refused to pay over to Cornerstone the accounts receivable purchased by Cornerstone.

322.   Despite entering the Olivet Purchase Agreement, Olivet University and Lin refused to pay over to Cornerstone the accounts receivable purchased by Cornerstone.

323.   Despite entering the WOA Purchase Agreement, WOA and Chiu refused to pay over to Cornerstone the accounts receivable purchased by Cornerstone.

324.   Upon information and belief, Pleros, Auden, Standard Goods, Standard Way, Rodem Tree, Olivet University, WOA, Lee, Kim, Ko, Osorio, Hwang, Chiu,

67

and Lin received all funds relating to the accounts receivable purchased by Cornerstone, then improperly used the funds for alternative uses, which include, but are not limited to, funneling said funds for the benefit of the Community.

325.    Because of the foregoing, Cornerstone was injured and suffered damage to its business and property in an amount to be determined at trial.

### Count Ten – Attorney's Fees Under Cal. Civ Code § 1717

### (All Defendants)

326.    Cornerstone incorporates by reference all previous and subsequent paragraphs of this Complaint as if fully set forth herein, verbatim.

327.    Pursuant to Cal. Civ. Code § 1717, the applicable confessions of judgment, the Purchase Agreements, 18 U.S.C. § 1964(c), and the causes of action set forth herein, Cornerstone hereby seeks to recover all reasonable and necessary attorney's fees and expenses it incurs as a result of the above-styled action.

## V.    CONCLUSION AND REQUEST FOR RELIEF

For the above-stated reasons, Plaintiff seeks recovery of all damages, general and special, in an amount to be determined at trial, recovery of pre- and post-judgment interest, treble damages, exemplary damages, punitive damages as available, costs of court, its reasonable and necessary attorney's fees, and any and all other relief that this Court finds equitable.

Respectfully submitted,

AUGUST LAW GROUP P.C.

/s/ Kenneth S. August
Kenneth S. August
California Bar No. 152704
19200 Von Karman Ave, Ste 600
Irvine, California 92612
(949) 752-7772
kaugust@augustlawgroup.com


*and*


SMITH & MEADOWS, LLC*

*/s/ Blake W. Meadows*
Blake W. Meadows, Esq.*
Georgia Bar No. 569729
215 Greencastle Road, Suite B
Tyrone, Georgia 30290
(404) 835 6506
blake@smithmeadowslaw.com
*Application for Pro Hac Vice
Admission Pending*